GARRY IRON & STEEL COMPANY, APPELLEE, v. OMAHA COAL
& BUILDING SUPPLY COMPANY, APPELLANT.

FILED MARCH 14, 1913.   No. 17,055.

1. **Trial:** DIRECTING VERDICT. The trial court should not submit a cause to the jury unless there is such a substantial conflict in the evidence upon the issue presented that a finding of the jury for either party would be sustained. If the court would be required to set aside a verdict for defendant, upon the pleadings and evidence, a verdict for the plaintiff should be directed.

2. ———: ———. Upon the pleadings and evidence stated in the opinion, the trial court rightly directed a verdict in favor of the plaintiff.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE. *Affirmed.*

*Mahoney & Kennedy,* for appellant.

*Crane & Boucher* and *J. W. Woodrough,* contra.

SEDGWICK, J.

The defendant is a corporation, and since the commencement of the transaction involved in this litigation has changed its corporate name, perhaps more than once. The plaintiff was engaged in the manufacture of Cleveland expanded metal lath, at Cleveland, Ohio, and in December, 1907, the defendant, in the name of the "Omaha Coal & Building Supply Company," entered into contract with the plaintiff whereby the plaintiff made the defendant its exclusive agent for the city of Omaha for the sale of its lath. In this contract the plaintiff agreed to furnish the lath at the price and on the terms named in the contract, and it was also agreed that the contract was subject to cancelation by either party upon 60 days' notice. Afterwards, the defendant ordered a car-load of the lath, which was duly shipped by the plaintiff and received on or about the 28th day of January, 1908. The plaintiff brought this action to recover the contract price for the lath, and, upon trial in the district court for Douglas county, the court directed the jury to find a verdict in favor of the plaintiff for the amount claimed, and, judgment having been entered, the defendant has appealed.

The defendant, in its answer, admitted the contract and the receipt of the lath as above stated, and alleged that before making the contract, and "as consideration for which defendant was to accept said offer, and as a representation of fact relied upon by the defendant, upon which defendant's acceptance of said offer was based, the plaintiff, through its agents and servants, deceitfully, knowingly and fraudulently stated and represented to the defendant that said Cleveland expanded metal lath was suitable for and reasonably fit for general building use in the city of Omaha, and in such territory immediately adjacent thereto as the defendant sought to cover in its sales; and that said Cleveland expanded lath was as serviceable and as marketable, and as reasonbly fit for use as the Herringbone lath, which latter lath has been satisfactorily

used in said city, and all places where defendant company
has sought to make sales, for a number of years; and that
said Cleveland expanded metal lath, which in its manu-
facture defendant represented is made to be placed on
'16-inch centers,' was satisfactorily serviceable and rea-
sonably fit for said particular use." The supposed failure
of the lath as warranted and represented is alleged in the
answer in these words: "Said lath was not and is not
suitable or reasonably fit for general building use in the
city of Omaha and the commercial territory contiguous
thereto, or elsewhere. Said lath was not and is not as
serviceable and marketable or as reasonably fit for use as
the Herringbone lath, and said lath was not and is not
reasonably fit or serviceable for use on '16-inch centers.'"

The plaintiff insists that this answer does not state any
defense; that the allegations are indefinite and merely
state conclusions and matters of opinion. It will be no-
ticed that there is no allegation in the answer as to the
material or workmanship, or of facts from which it could
be determined whether the lath was suitable or reason-
ably fit for the purposes for which it was intended, or
was as fit for use as the Herringbone lath, or fit for use
on "16-inch centers." The evidence which is supposed to
support the defense is still more indefinite and uncertain.
The trial court regarded the allegations of the answer as
sufficient to admit of proof, but found that the evidence
was wholly insufficient to constitute any defense to the
plaintiff's claim.

It is a rule now well established in this court that the
trial court should not submit a cause to the jury unless
there is such a substantial conflict in the evidence upon
the issue presented that the finding of the jury for either
party would be sustained. If the court would be required
to set aside a verdict for the defendant upon the plead-
ings and evidence, and so make another trial of the issue
necessary, the cause should not be submitted to the jury,
but should be determined by the court.

The trial court in his opinion stated, in effect, that the

27

evidence showed without any substantial conflict that the lath in question "is one of general use * * * all over the country * * * and has a value known and accepted among builders and the trade." There is evidence tending to show that this lath had not been used at all in Omaha, and that the defendant had no knowledge whatever of the Cleveland expanded metal lath at the time it entered into the contract, but this is not in conflict with the evidence of the dozen or more witnesses who testify that this lath was in general use in St. Louis, Kansas City, San Francisco, Cleveland, and other cities throughout the country.

The trial court also concluded "that the defendant at the time the contract was made had a general knowledge of metallic lathing." The defendant says that this is erroneous, because the evidence shows "that not only was the defendant unfamiliar with Cleveland expanded metal lath, but that it had not handled any metal lath." We think the evidence shows beyond question that the defendant at the time of entering into this contract had a general knowledge of metallic lathing. Mr. Monaghan, the defendant's manager, who ordered the goods in question, testified that he had never seen or known of that lath at that time, and that no member of the defendant company had, but he also testified: "We had sold it (metal lath) and bought it from others, and were familiar with the stock lath, but did not carry it ourselves. If we got a call for metal lath, we got it from those who had it and delivered it, and in that way dealt with it, but not extensively. In that way I had informed myself of the different kinds of lath on the market, and what its purposes were, and what it was adapted to, and what it ought to look like, and how it ought to feel, whether it was stiff or not, and how it was used." The evidence shows that metal lath was very much used in Omaha, and that the defendant was then, and had been for a long time, engaged in dealing in building materials, including metal lath, and the witness was no doubt correct in saying that

the defendant was informed of the different kinds of lath, and what its purposes were, and what it was adapted to, and what it ought to look like, and how it ought to feel, whether it was stiff or not, and how it was used.

We think, also, the trial court was right in concluding "that the difference in the value for building purposes and uses of the Herringbone lath and that in question is shown to be one wherein one might be better for certaiu uses than another, depending largely upon the conclusion of the ones using it." The defendant admitted the con tract and the receipt of the property, and had the burden of establishing its alleged defense. Two grades of lath were included in the purchase, called 24 gauge and 27 gauge. One witness testified that "the 24 gauge is thicker than the 27 gauge lath." The defendant offered no evidence explaining the difference in the use of these grades or whether there is any substantial difference. We cannot tell from this evidence whether it is contended that both grades are defective or whether there is any difference in that regard, or whether the respective grades were intended for different conditions and were used as intended.

The defendant called two witnesses who testified as to the character of this lath. Mr. Anderson, who had been engaged in the "plastering contract business" for 20 years, testified that he was familiar with the character of building construction in Omaha; that in general the distance between the studding and joists is 16 inches, but in some cases there are what are called 12-inch centers; that he tried to use the Cleveland lath on the Omaha Gas Company's building, and found "it would take too much labor and material to cover it, so we did not use it any more." They used about 50 yards on 16-inch centers. "The lath was too flexible. When we applied the mortar to it, it bagged down from the ceiling, and it would take a great quantity of mortar to fill up the depressions left so as to level off the ceiling. The lath bagged down after the first coat, and then we had to fill the whole surface in

order to get it even with the bagged places to make the surface level. This required the use of more plaster. Double tying means when you tie for 16-inch centers between the joists. We double tied this lath. We do not have to tie the Herringbone lath at all. It will stand without tying, but the Cleveland lath will not. After we found how the Cleveland lath operated, we refused to use any more of it." He also stated: "I don't consider it worth anything for 16-inch centers; I lost more material and labor than what the difference is between the Herringbone and this lath, or about such an amount." He said: "There was no value to it." When asked what was the market value, he answered: "The only thing I know about the market value is what they ask for it when they sell it. I think that was 16 to 17 cents per square yard. * * * It was valueless to me. Q. Well, how about the trade generally beside yourself? A. I considered it for every man that used it, it was valueless. Q. You mean by that without market value? A. Yes." On cross-examination he testified that he used the Cleveland lath afterwards, and paid the regular price for it. The other witness called by the defendant was Mr. Rice, who testified that he had been in the plastering business for 40 years, and "saw the Cleveland lath on the Hanson restaurant on Sixteenth street." The lath was on before he saw it, and they could not plaster on it at all. "We had to give the lathers extra time for the work. The lath required more labor than ordinarily. The extra cost of mortar and labor required in using the Cleveland lath amounted to one-third more than in the case of the use of any other lath I ever used." They made no attempt to state which grade of the Cleveland lath they used, nor the conditions under which they used it, nor any defect in its material, manufacture or design. They stated conclusions, and their evidence shows that they are stating matters of opinion, and not facts from which the jury might draw a conclusion.

The plaintiff called Mr. Dietz as witness, who testified that he had been a lather for 27 years, and had used large

quantities of material, lathing 18,000 yards on one building. He had used the Pittsburg and Herringbone and Cleveland lath. He named several important buildings on which he had used the Cleveland lath. He described the · Herringbone lath as follows: "The Herringbone lath is awfully weak. In fact, you can't use it on 16-inch centers. It is like a lot of ribs, and will break if you bend it. You can bend the Cleveland lath in any way you want. It's heavier and stiffer. To my estimation it is 100 per cent. better than Herringbone lath. The Herringbone lath is too weak and will sag if you put it on 16-inch centers, or ceilings, or partitions, and, if you get mortar on it, it will sag down. It is almost impossible to use it on 16-inch centers. The Cleveland lath is better in every way, and I have never had any trouble with it. I have no interest in this case." Mr. Sparks had been a plasterer about 16 years, and he testifies that "Cleveland lath is very superior to the Herringbone lath in regard to stiffness, and in requiring less mortar, less time for workmen, and that the Cleveland lath, when used on 16-inch centers, will give good results, being heavier and stiffer than the Herringbone lath, and that, when putting mortar on the Herringbone lath, it will drop back and go through, which is not the case with the Cleveland lath, and that the Cleveland lath is the best for general use and for all purposes the witness ever used lath." Several other witnesses for the plaintiff testified to the same effect.

It will be noticed that none of the defendant's witnesses testified to any defect in the lath in its material, manufacture, workmanship, or design. The evidence is without conflict that this lath is in general use in many places; that it is regarded by contractors and builders as a standard article; and that there is a variety of opinion as to which of several kinds of metal lath is the most desirable, depending, so far as this evidence shows, upon the kind of work that is being done and the conditions and circumstances under which it is used. After the defendant had received the lath in question, which was in January, 1908,

there was considerable correspondence between the parties as to the merits of the lath and the condition of the market and the payment of the plaintiff's claim. The letter to the plaintiff on the 11th of May stated that the defendant had paid the plaintiff about $40 on the account, and under date of May 26 the defendant stated that the market in Omaha on metal lath had declined 2 cents per yard, and that the defendant had made concessions in price until the profit amounted to nothing, but had failed to get the business; that the Herringbone lath was being sold on the market at 14 cents, which was less than, or practically equal to, the cost of lath to the defendant, and that the defendant would be willing to handle the lath on a margin of ½ a cent a yard, but could not afford to sell it below cost. The letter continued: "We will endeavor to introduce this lath in this market, and it seems only justly fair that you should make some concession in prices to us. The lath is thought very well of by contractors who have used it. It answers the purpose very satisfactory on 12-in. centers, but does not give satisfaction on 16-in. centers. The Herringbone seems to be the ideal lath on 16-in. centers, and especially on ceiling work. On exterior work, the Garry lath is giving good satisfaction. Now, consider this matter carefully and from a business standpoint, and advise us as soon as possible if you can make our price at Omaha the same as you quoted us f. o. b. Cleveland. I am almost certain that this will enable us to get the business, and at least meet the prices quoted by Sunderland Bros. on Herringbone. The only way to introduce this metal lath in Omaha is to have a price a little more favorable than that price which Herringbone is sold." The letter of May 26 shows that the defendant had investigated and tested the lath. It states what was claimed to be a point in favor of the Herringbone lath, and also points in favor of the lath in question, and amounts to an admission that the lath received by them was a compliance with their contract.

Under these conditions, the general statement of two

witnesses that they were dissatisfied with the lath and preferred to use some other manufacture would not support a finding that the lath was defective, or that the defendant had in any way violated the terms of its contract.

The district court was therefore right in instructing the jury to find a verdict for the plaintiff, and the judgment is

AFFIRMED.